UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

MARY T. BOURGEOIS
FOR BENJAMIN BOURGEOIS,

    Plaintiff,

  v.

MICHAEL J. ASTRUE, Commissioner of
Social Security,

    Defendant.

CASE NO. C08-5677FDB-KLS

REPORT AND RECOMMENDATION

Noted for December 4, 2009

Mary T. Bourgeois, on behalf of Benjamin Bourgeois (hereinafter referred to as "plaintiff"), has brought this matter for judicial review of the decision finding Benjamin Bourgeois no longer eligible for supplemental security income ("SSI") benefits, and assessing an overpayment thereof. This matter has been referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule MJR 4(a)(4) and as authorized by Mathews, Secretary of H.E.W. v. Weber, 423 U.S. 261 (1976). After reviewing the parties' briefs and the remaining record, the undersigned submits the following Report and Recommendation for the Court's review.

## FACTUAL AND PROCEDURAL HISTORY

Plaintiff, a minor child, was found to be disabled in December, 2005, thereby becoming eligible for SSI benefits. Tr. 10. On March 1, 2007, plaintiff's parents "were notified that he was no longer eligible for SSI benefits as of November 1, 2006, due to excess income," and that he "had been overpaid

supplemental security income, in the amount of $1,455.24, for the benefits received from November 1, 2006 to February 2007." Tr. 10, 19-23.  On reconsideration, that determination was affirmed. Tr. 10, 36-39.

On December 18, 2007, a hearing was held before an administrative law judge ("ALJ"), at which plaintiff, represented by counsel, appeared, as did plaintiff's mother. Tr. 70-98.  At the hearing, plaintiff's mother testified that because they did not have the medical specialists required to treat plaintiff's mental disorder at, or within a reasonable driving distance from, Dyess Air Force Base in Abilene, Texas, where plaintiff's father was an Airman in the United States Air Force, they requested a hardship transfer.[1] Tr. 53, 80, 82.  She testified that it took two and a half years to get the documentation to prove that Abilene was not the best place for them and that they needed to leave. Tr. 82.

Plaintiff's mother testified that upon transferring to McChord Air Force Base in Washington, they were able to receive at least some beneficial treatment for plaintiff's disorder. Tr. 53, 83-85.  She testified that upon arriving in Washington, the family had to move into temporary living facilities on McChord Air Force base for 30 days, because there was no permanent housing available to them there. Tr. 85.  At the time of the hearing, on-base housing still was unavailable. Id.  Plaintiff's mother further testified that the termination of plaintiff's SSI benefits had a significant financial impact on them, which prevented them from being able to make needed purchases, put them behind on their bills, and limited them to the "bare minimum" treatment for her children. Tr. 86-88.

On July 11, 2008, the ALJ issued a decision, determining that the termination of plaintiff's benefits and resulting overpayment were proper, finding specifically in relevant part:

(1) because plaintiff lived with his parents, "an apportionable amount" of their income was "deemed income" to him;

(2) the Basic Allowance for Housing ("BAH") plaintiff's father was paid properly was deemed income apportionable to plaintiff under the Program Operations and Manual System ("POMS") and Social Security regulations; and

(3) the BAH received by plaintiff's father properly was included in the income apportionable to plaintiff in determining his eligibility for SSI.

Tr. 10-12.  The ALJ, though, declined to address "[a] potential issue as to the waiver of collection of the

---

[1] Plaintiff's parents had two other children with the same or similar mental disorder for whom they also needed specialized treatment, but neither is a party to this case or before this Court for judicial review.

REPORT AND RECOMMENDATION
Page - 2

overpayment" of SSI benefits, finding the record contained "insufficient information regarding the finances of" plaintiff's family, thereby precluding "any determination whether collection of the overpayment would cause hardship to the family." Tr. 12. On September 15, 2008, plaintiff's request for review of the ALJ's decision was denied by the Appeals Council, making it the Commissioner's final decision. Tr. 3; 20 C.F.R. § 416.1481.

On November 12, 2008, plaintiff filed a complaint in this Court seeking review of that decision. (Dkt. #1). Specifically, plaintiff argues that the decision should be reversed, the overpayment should be eliminated or waived and his SSI benefits should be restored because:

(a) there was no change in the income of plaintiff's family;

(b) many other types of income specifically are excluded from consideration by federal law when determining SSI; and

(c) denying SSI benefits to a family with two disabled children is manifestly contrary to the purposes of SSI.

For the reasons set forth below, however, the undersigned disagrees that the ALJ erred in his decision, and therefore recommends that the ALJ's decision be affirmed.

## DISCUSSION

I. <u>Determining Eligibility for and the Amount of Benefits Under the SSI Program</u>

    A. <u>Purpose of the SSI Program</u>

"In 1972, Congress enacted the SSI program to provide assistance 'to individuals who have attained age 65 or are blind or disabled' by providing cash subsistence payments to indigent persons who have a disability expected to last more than twelve months." <u>Department of Health &Human Services v. Chater</u>, 163 F.3d 1129, 1133 (9th Cir. 1998) (quoting 42 U.S.C. § 1381). Two purposes are subsumed within that program. "[F]irst[,] is the government's goal to provide a minimally decent standard of living to destitute, blind, aged and disabled individuals." <u>Id.</u>; <u>see also</u> 20 C.F.R. § 416.110. "[S]econd[,] is the government's need to prevent the dissipation of its resources through neglect, abuse, or fraud." <u>Chater</u>, 163 F.3d at 1133.

    B. <u>Deeming Income to a Child Claimant</u>

"[T]he amount of income" a claimant has "is a major factor in deciding whether" that claimant is "eligible for SSI benefits and the amount of" those benefits. 20 C.F.R. § 416.1100. In general, the greater

the income a claimant has, "the less" his or her benefits will be. Id. Consequently, if a claimant is determined to have "too much income," that claimant will not be eligible for any benefits. Id. Not all of a claimant's income, however, is counted in determining SSI eligibility and benefit amount. Id. In addition, for the purpose of determining such eligibility and amount of SSI benefits:

> [F]or any individual who is a child under age 18, such individual's income and resources shall be deemed to include any income and resources of a parent of such individual (or the spouse of such a parent) who is living in the same household as such individual, whether or not available to such individual, except to the extent determined by the Commissioner of Social Security to be inequitable under the circumstances.

42 U.S.C. § 1382c(f)(2)(A); see also 20 C.F.R. § 416.1160(a). In deeming such income and resources as noted above, furthermore, "it does not matter whether the income of the other person is actually available to" the claimant. 20 C.F.R. § 416.1160(a).

In the case of a child claimant under age 18, the Commissioner looks at the income of that child's "ineligible parent[(s)]" to decide whether any of that income should be deemed to that claimant. 20 C.F.R. § 416.1160(a)(2). "Ineligible parent means a natural or adoptive parent, or the spouse . . . of a natural or adoptive parent, who lives with" the child claimant "and is not eligible for SSI benefits." 20 C.F.R. § 416.1160(d) (ineligible parent's income affects child claimant's benefits only if that claimant is under age 18). The Commissioner follows "several general steps to determine how much income to deem." 20 C.F.R. § 416.1160(c). They are:

(1) First, "how much current monthly earned and unearned income" the ineligible parent has is determined, subject to "appropriate exclusions";

(2) Next, "an allocation for each ineligible child[2] in the household" is deducted;

(3) Lastly, except for those ineligible parent(s) who are receiving "public income-maintenance payments," the following monthly allocations are deducted: first, "$20 from the parents' combined unearned income," and then, "$65 plus one-half the remainder of their earned income."

20 C.F.R. § 416.1160(c), (d); 20 C.F.R. § 416.1165(a), (b), (d). The unearned income that remains then is deemed to be the child claimant's, along with any of the claimant's own unearned income, again subject to certain exclusions, to determine his or her "countable unearned income," to which is added "any countable earned income" he or she may have. 20 C.F.R. § 416.1165(e)(1). If there is "more than one eligible child

---

[2] An "ineligible child" is "a natural child or adopted child" of a parent or that parent's spouse, who "lives in the same household" therewith and who "is not eligible for SSI benefits." 20 C.F.R. § 416.1160(d).

REPORT AND RECOMMENDATION
Page - 4

under age 18 in the household," the "parental income" is divided, so as "to be deemed equally among those eligible children." 20 C.F.R. § 416.1165(e)(2).

C. <u>Types of Income Recognized</u>

"Income is anything" the SSI claimant receives "in cash or in kind," which can be used to meet his or her "needs for food and shelter." 20 C.F.R. § 416.1102. Income includes both "earned" and "unearned" income. 42 U.S.C. § 1382a(a). The term "earned income" refers only to: wages; "net earnings from self-employment"; "remuneration received for services performed in a sheltered workshop or work activities center"; and royalties and honoraria. 42 U.S.C. § 1382a(a)(1). "[U]nearned income," on the other hand, "means all other income," including: "support and maintenance furnished in cash or kind"; "any payments received as an annuity, pension, retirement, or disability benefit"; "rents, dividends, interest, and royalties"; and "payments to or on behalf of a member of a uniformed service for housing of the member (and his or her dependents, if any) on a facility of a uniformed service."[3] 42 U.S.C. § 1382a(a)(2).

"Earned income may be in cash or in kind." 20 C.F.R. § 1110(a). "[I]n-kind earned income" that consists of wages "may also include the value of food, clothing, or shelter, or other items provided instead of cash." 20 C.F.R. § 416.1110(a). Unearned income, which, as noted above, "is all income that is not earned income," also may be received "in cash or in kind." 20 C.F.R. § 416.1120. In addition, "[i]n-kind income is not cash, but is actually food or shelter, or something," which can be used "to get one of these." 20 C.F.R. § 416.1102; <u>see also</u> 20 C.F.R. § 416.1103 (some things received are not income because they cannot be used as food or shelter, or to obtain food or shelter). Also as noted above, "unearned income" includes "[s]upport and maintenance in kind." 20 C.F.R. § 416.1121(h). This consists of "food, or shelter furnished to" the claimant. <u>Id.</u>

D. <u>The Basic Allowance for Housing</u>

The primary issue in this matter is the ALJ's determination that the Basic Allowance for Housing ("BAH") paid to plaintiff's father, properly was deemed income apportionable to plaintiff under the POMS and the Commissioner's regulations. Tr. 11. In particular, the ALJ found as follows:

The Basic Allowance for Housing is considered income to the claimant's father,

---

[3]This last type of unearned income – payments for housing on a military facility – was added to 42 U.S.C. § 1382a(a)(2) effective September 1, 2008. <u>See</u> Heroes Earnings Assistance and Relief Tax Act of 2008 (the "HEART Act"), P.L. 110-245, Sections 201, 204.

REPORT AND RECOMMENDATION
Page - 5

> Airman Bourgeois because "income is everything you receive in cash or in kind that you can use to meet your needs for food or shelter." *See* 20 C.F.R. § 416.1102. More specifically, the housing allowance payments are "special payments received because of your employment." *See* 416.1110(a). *See also* [POMS] SI 00830.540D.2 (explaining that allowances paid to service members who live off base in completely private housing are "chargeable unearned income" to the service member), unlike the provision of on base housing the value of which is not considered income for Social Security purposes. On base housing presumably is provided for the convenience of the employer, the United States government. Analogous to the current situation is Section 119 of the Internal Revenue Code, which excludes from gross income the value of lodging provided by an employer for the convenience of the employer, provided the employee is required to accept such lodging on the business premises of the employer as a condition of his employment. Contrary to the argument of the claimant's counsel, I do not find the distinction in the social security treatment of on base housing versus off base housing to be arbitrary or capricious.
>
> Because it is income to Airman Bourgeois, an apportionable amount of the income of the parents including the BAH is deemed income to the claimant, to be used in the determination of his eligibility for benefits under Title XVI. *See* 20 C.F.R. § 416.1160(a)(2).
>
> I find no exception for this kind of income in the Social Security Act, regulations or POMS. The Basic Allowance for Housing paid to the claimant's father was properly part of his income which is apportionable to the claimant under the POMS and regulations.

Tr. 11-12.

Federal law provides that for any "member of a uniformed service who is entitled to basic pay," that member also "is entitled to a basic allowance for housing." 37 U.S.C. § 403(a). The amount of such BAH "will vary according to" the service member's pay grade, dependency status and geographic location. Id. The POMS – "[t]he Social Security Administration's . . . publicly available operating instructions for processing Social Security claims" – defines BAH as "an amount of money that a service member receives to pay for housing not provided by the Government," noting further that "[t]he BAH was designed to make housing allowances more equitable throughout the services and the ranks, and more in line with civilian cost of living in the areas surrounding military installations." <u>Washington State Dept. of Social and Health Services v. Guardianship Estate of Keffeler</u>, 537 U.S. 371, 385 (2003); POMS SI 00830.540B.5; POMS SI 00820.400B.4.[4]

The POMS goes on to note:

> In some cases, the service branch may pay a BAH to a service member living in free

---

[4] POMS SI 00830.540 was in effect prior to September 1, 2008, and thus during the time period relevant to this matter. <u>See</u> https://secure.ssa.gov/apps10/poms.nsf/lnx/0500830540!opendocument. POMS SI 00820.400, on the other hand, became effective "on or after" September 1, 2008. <u>See</u> https://secure.ssa.gov/apps10/poms.nsf/lnx/0500820400!opendocument.

REPORT AND RECOMMENDATION
Page - 6

>  on-base housing, but then deduct the allowance (rather than rent) in the same month.
>  This transaction is merely for accounting purposes and results in a zero payment
>  transaction. What actually is received is rent-free shelter. . . .

Id.; see also POMS SI 00830.540D.9 ("Many military bases have not yet privatized and still provide service members with military housing. For these situations, we treat the military housing as rent-free shelter and count it as outside ISM [in kind support and maintenance]."). It further states:

> Military bases enter into privatization agreements with private companies to provide
> housing for military personnel. Under privatization, the private company builds or
> renovates military housing and makes it available for rent to service members. The rent
> is limited to the service member's BAH. Privatized housing may be on the military
> base or off the base. . . .

POMS SI 00830.540B.17. In addition, BAH is not "income" for SSI purposes if "the service member lives in free on-base housing" and "the allowance is paid and deducted in the same pay period," but, again, "the shelter provided may result in ISM to the claimant." POMS SI 00830.540D.4. So too, "[w]hen a service member lives in privatized military housing, and the military base directs a BAH to the housing contractor by way of a payroll deduction or allotment in order to provide housing, the BAH is counted as outside ISM . . . , not as cash unearned income." POMS 00830.540D.9. The POMS, on the other hand, expressly provides that for service members who "live off base in completely private housing," BAH is counted "as cash unearned income." Id.

II. The BAH Received by Plaintiff's Father Was Properly Allocated as Income and Apportionable to Plaintiff in Determining his Eligibility for SSI Benefits

In challenging the ALJ's finding on this issue, plaintiff argues that because there was no change in his father's income, plaintiff should not have been found ineligible for SSI benefits. Specifically, plaintiff asserts that usually a determination of ineligibility due to excess income or resources, is due to an increase in actual income or resources to the household, and that in most cases the claimant "has some control over the amount of income or resources" in the household. (Dkt. #11, pp. 10-11). Plaintiff argues there was no such change in this case, though, as his father's income is set according to pay grade and time in service, and no one else in the household has any income of their own. Rather, plaintiff further argues, the only change was "in the duty station and the fact that the family was not able to secure on-post housing," which he asserts is not an actual change in income or resources. (Id. at p. 11).

Plaintiff goes on to state that his father received $1200.00 a month in BAH, and that had the family instead been allocated free on-base housing or privatized military housing, the payment would have been

REPORT AND RECOMMENDATION
Page - 7

the same, but whereas the former counted as cash unearned income, the latter two types of housing would not have been so treated. In such a situation, plaintiff argues, where the same amount of money is allocated for the same purpose (i.e., as payment to the housing provider), and the household in effect never actually "receives" the allotment, there should be no difference in how the allotment is treated. (Id.). Treatment of BAH in this manner, plaintiff contends, assumes that service members and their families who live off-post do so by choice, unlike in this case, and ignores issues families with disabled children may face in on-base housing, which they would not face off-base. "In such a situation," plaintiff asserts, "the family should not be penalized for choosing what's best for their children." (Id. at p. 12).

Like defendant, however, while the undersigned does recognize that in some situations, such as that faced by plaintiff and his family, the manner in which the Commissioner treats BAH may result in difficult and unforeseen consequences, and while the undersigned is not unsympathetic to their plight, plaintiff has failed to demonstrate error on the Commissioner's part here. In essence, what plaintiff is arguing is that in promulgating those sections of the POMS dealing with BAH under the SSI program, the Commissioner did not properly implement the intent of Congress. As noted by the Ninth Circuit, "Congress vested authority to promulgate rules and regulations implementing the SSI program in the Commissioner." Chater, 163 F.3d at 1133. As the Social Security Act itself provides:

> The Commissioner of Social Security shall have full power and authority to make rules and regulations and to establish procedures, not inconsistent with the provisions of this subchapter, which are necessary or appropriate to carry out such provisions, and shall adopt reasonable and proper rules and regulations to regulate and provide for the nature and extent of the proofs and evidence and the method of taking and furnishing the same in order to establish the right to benefits hereunder.

42 U.S.C. § 405(a). The Supreme Court has set forth the following procedures for determining whether an administrative agency's construction of the statute governing it should be upheld:

> When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-43 (1984) (internal

footnotes omitted); see also Immigration and Naturalization Service v. Cardoza-Fonseca, 480 U.S. 421, 447-48 (1987) ("The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent. . . . If a court . . . ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect.") (citation omitted).

On the other hand, "[t]he court need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding." Chevron, 467 U.S. at 843, n.11. Indeed, "[t]he power of an administrative agency to administer a congressionally created . . . program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress." Id. at 843. As the Supreme Court went on to explain:

> . . . If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation. Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute. Sometimes the legislative delegation to an agency on a particular question is implicit rather than explicit. In such a case, a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency.
>
> We have long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer, and the principle of deference to administrative interpretations
>
>> "has been consistently followed by this Court whenever decision as to the meaning or reach of a statute has involved reconciling conflicting policies, and a full understanding of the force of the statutory policy in the given situation has depended upon more than ordinary knowledge respecting the matters subjected to agency regulations. . . . "If this choice represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute, we should not disturb it unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned."

Id. at 843-45 (internal citations and footnotes omitted); see also Cardoza-Fonseca, 480 U.S. at 448; see also Christensen v. Harris County, 529 U.S. 576, 586-87 (2000) (courts must give effect to agency's regulation containing reasonable interpretation of ambiguous statute). In addition, as the Ninth Circuit expressly has noted with respect to the Social Security Administration:

> In *Thomas Jefferson Univ.*[ *v. Shalala*, 512 U.S. 504 (1994),] the Supreme Court stated:
>
>> [W]e must give substantial deference to an agency's interpretation of its own regulations. Our task is not to decide which among several competing

> interpretations best serves the regulatory purpose. Rather, the agency's interpretation must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation.
>
> 512 U.S. at 512, 114 S.Ct. at 2387 (quotations and citations omitted). An agency's interpretation must be deferred to "unless an alternative reading is compelled by the regulation's plain language or by other indications of the [Commissioner's] intent at the time of the regulation's promulgation." *Id.* This deference is warranted all the more when "the regulation concerns a complex and highly technical regulatory program, in which the identification and classification of relevant criteria necessarily require significant expertise and entails the exercise of judgment grounded in policy concerns." *Id.*

Chater, 163 F.3d at 1134.

In regard to an agency's construction not "arrived at after . . . a formal adjudication or notice-and-comment rulemaking," however, "such as those . . . contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law," such construction does "not warrant *Chevron*-style deference." Christensen, 529 U.S. at 587 (noting further that *Chevron* deference does apply to agency interpretations contained in regulations). Further, while such internal policy interpretations "are 'entitled to respect,'" that respect extends only as far as those interpretations "have the 'power to persuade.'" Id. (citations omitted). Therefore, although the POMS – including the agency "administrative interpretations" contained therein – is merely a "policy manual" and not a product "of formal rule-making," and, as such, lacks "the force and effect of law," it "is, nevertheless, persuasive [authority]" and "warrant[s] respect." Keffeler, 537 U.S. at 385; Schweiker v. Hansen, 450 U.S. 785, 789 (1981); Warre v. Commissioner of the Social Security Administration, 439 F.3d 1001, 1005 (9th Cir. 2006); Hermes v. Secretary of Health & Human Services, 926 F.2d 789, 791 n.1 (9th Cir. 1991).

In this case, although plaintiff certainly may disagree with how the Commissioner treats BAH in the POMS, he has not shown it to be contrary to the intent of Congress, which has not spoken to the precise question at issue in this case. Nor has plaintiff shown the Commissioner's treatment thereof to be arbitrary and capricious, or otherwise unreasonable or undeserving of judicial respect. Indeed, the Commissioner's interpretations of the rules and regulations it has promulgated to administer the SSI program are deserving of particular deference, given the Commissioner's expressly granted authority to promulgate and interpret them, and the fact that SSI is the type of "complex and highly technical regulatory program," in regard to which the "identification and classification of relevant criteria necessarily require[s] significant expertise." Chater, 163 F.3d at 1134.

As to plaintiff's first contention – that an SSI claimant usually becomes ineligible for benefits due to excess income and resources, when there is an increase in earnings from a job or other source or another income earning member joins the household – no evidence has been presented to this Court to demonstrate that this is so. Nor does this contention, even if supportable, mean that an increase in income that results in SSI ineligibility cannot be the result of receipt of other types of financial support, such as payments for the purpose of acquiring housing, including BAH. The same is true in regard to plaintiff's second contention that in most cases, an SSI claimant has some control over his or her household income. Indeed, the lack of such control often is strongly linked to a claimant's eligibility for SSI benefits, at least from the standpoint of the program's financial requirements.

Accordingly, the fact that there was no change to the basic pay plaintiff's father received, and that none of the other members of plaintiff's household had any earnings of their own, does not alone mean that the family's income had not increased. The undersigned further rejects plaintiff's argument that no change in income occurred in his case, because his family's receipt of BAH merely was the result of changing duty stations, and because of a resultant inability to secure on-base housing. As the Commissioner's regulations expressly state, income includes "anything" received "in cash or in kind," used to meet one's "needs for food and shelter." 20 C.F.R. § 416.1102. There is no dispute here that plaintiff's father received support in the form of cash for the purpose of securing private housing, i.e., BAH.

Plaintiff argues this receipt of BAH in the form of cash payment cannot be treated as an increase in income, because: (1) it was the exact amount of the family's rent; (2) the amount would have been the same had the family been allocated for on-base or privatized military housing; and (3) the payment in all three situations is for the same purpose, that is, an allotment to provide housing. This argument, however, is both unpersuasive and misses the point. In plaintiff's view, the Commissioner should base the decision as to how to treat BAH for purposes of calculating household income, on whether there are any variances in the value of the allowance depending on the type of housing provided, and whether the allowance is to ultimately go to the service member or the housing provider.

While certainly that is one policy basis upon which the Commissioner could have chosen to treat BAH, it was not the only, or even most rational, one. As pointed out by defendant, the distinction made by

1  the Commissioner between the three types of military housing allotments – on-base, privatized military
2  and completely private – is whether or not the allotment is in the form of a cash payment. In the first
3  situation, where the housing is being provided directly by the government, no actual payment is involved,
4  and thus it is not in fact BAH. See POMS SI 00830.540B.5 ("The basic allowance for housing (BAH) is an
5  amount of money that a service member receives to pay for housing not provided by the Government.").
6  Apparently, though, sometimes in this situation, "the service branch may pay a BAH to a service member
7  in free on-base housing, but then deduct the allowance (rather than rent) in the same month," which is
8  done "merely for accounting purposes[,] and results in a zero payment transaction." Id.

9  In neither case, however, does the service member actually receive any cash payment, since in
10  the latter situation, "the allowance is paid and deducted in the same pay period." POMS SI 00830.540D.4.
11  As such, the undersigned finds nothing arbitrary or capricious in the Commissioner's treatment of this kind
12  of transaction as being "merely for accounting purposes." Plaintiff asserts this approach makes no sense,
13  (a) because the transaction appears on the service member's pay stub and thus constitutes a payment to
14  him or her, and (b) "[o]ne cannot deduct something that was never there in the first place." (Dkt. #16, p. 2).
15  But in regard to the first point, the service member never has any control over the payment, and, indeed, it
16  is taken away before the member even receives his or her pay. As such, while the transaction does take
17  place and is credited to the service member, the cash does not transfer to him or her. Because of this,
18  plaintiff's second point is moot, in that the service member again has received no actual cash payment.

19  The same reasoning applies to the second-type of housing situation – privatized military housing
20  – where "the military base directs a BAH to the [private] housing contractor by way of a payroll deduction
21  or allotment in order to provide housing." POMS SI 00830.540D.9. Here, too, the payment is transferred
22  and deducted in the same pay period, and thus never reaches the service member in the form of a payment
23  of cash, and over which the service member can exert any control. This is not true with respect to the last
24  type of housing, "off base . . . completely private housing," which, unlike any of the other types of housing
25  discussed above, does "count . . . as cash unearned income." Id. In such situations, the service member is
26  provided with an actual cash allotment, with respect to which he or she then can decide in what manner to
27  dispose of it, including how much of the allotment to direct toward housing.

28  Plaintiff asserts this constitutes no actual choice on the part of the service member who decides,

or is forced, to choose the entirely private housing route, as the only other option is loss of housing. This, though, greatly overstates the level of risk alleged here. It is true that BAH is determined, at least in part, by "the geographic location of the member" and the "housing costs in the local area." 37 U.S.C. § 403(a); POMS 00830.540D.9. However, as defendant notes, this does not mean that a service member is prevented from finding housing that is cheaper than the BAH he or she receives, thereby receiving a very real increase in his or her cash income. Indeed, there does not appear to be any requirement by the service member to then have to return any portion of the BAH not actually spent on rent.

Plaintiff's situation is a case in point. While plaintiff asserts the BAH his father received was the exact amount of his rent, $1,200.00, the record shows otherwise. On at least two occasions in late 2006 and early 2007, for example, the BAH plaintiff's father received was $1294.00 and $1,324.00 respectively, while the amount of rent plaintiff's family had to pay remained at $1,200.00. See Tr. 14, 52, 58. As such, it seems plaintiff's family received some $218.00 in cash that they did not have to spend on rent, and which it also appears they were able to keep. This illustrates the basic difference between the treatment of BAH in regard to on-base and privatized military housing and completely private off-base housing, the former involve no actual cash transfers to the service member, whereas the latter does. It thus was not improper to distinguish the different types of BAH payments on this basis.

The remainder of plaintiff's challenges to the Commissioner's treatment of BAH in the POMS are all policy-based. First, plaintiff notes his mother testified that no on-base housing was available more than two years after their move to McChord Air Force Base, during a time when he asserts that demand for such housing increased, whereas the POMS appears to have been drafted prior thereto, when "the situation on military bases may have been very different from what it is now." (Dkt. #11, p. 12). Plaintiff, however, has presented no actual evidence that this is the case. But even if it were so, it is for Congress, and not the courts, to determine whether it is appropriate to change the law concerning allocation of BAH in regard to off-base private housing on this basis. See Reeves v. Astrue, 526 F.3d 732, 738 (11th Cir. 2008) ("[P]olicy decisions are properly left to Congress, not the courts . . . '[w]hatever merits . . . policy arguments may have, it is not the province of [the courts] to rewrite the statute to accommodate them.'") (quoting Artuz v. Bennett, 531 U.S. 4, 10 (2000)).

The same is true in regard to plaintiff's next policy argument, that "there are issues that a family

with disabled children may face in on-base housing that they will not face off-base," such as, for example, in a situation where "even if on-base housing is available, it may not be the safest or best option for parents with two disabled children." (Dkt. #11, p. 12). But again, while it certainly may be desirable from a policy perspective to not, as plaintiff puts it, penalize a family "for choosing what's best for their children," such policy determinations are reserved for Congress, not the judiciary. (Id.). As the Fourth Circuit has noted in the context of construing the Equal Access to Justice Act:

> In sum, [the plaintiff] asks us to "improve the statute – to amend it, really." We cannot do that, however, "without trespassing on a function reserved for the legislative branch." Thus, while we may be sympathetic to the concerns raised by [the plaintiff], sympathy does not permit us to ignore the plain language of the statute.

Stephens v. Astrue, 565 F.3d 131, 140 (4th Cir. 2009) (internal citations omitted); see also Panola Land Buying Ass'n v. Clark, 844 F.2d 1506, 1514 (11th Cir. 1988) ("It is for Congress to consider any revision to the [statute] or to otherwise address what the . . . [plaintiff] . . . see[s] as a serious problem. This court can no more formulate a solution, which it is implored to do in this case, than it can appropriate the funds necessary to effectuate a solution.").

Plaintiff further notes other federal statutes require the SSI program to specifically exclude many types of income and resources when considering a claimant's eligibility for benefits. See 20 C.F.R. Pt. 416, Subpt. K, App. Although plaintiff "does not dispute that these are worthy" exclusions, he finds them to be "arbitrary" because they were "championed by a certain group or political interest," the "particular need[s]" of which are no greater than for those of him and his family. (Dkt. #11, p. 13). Once more, however, no evidence has been provided to the Court to show that this is indeed why such exclusions were adopted, and even if that is the case, it was Congress – through enactment of federal legislation creating those exclusions – that adopted them, and it is only Congress that can amend them.

That the loss of SSI benefits may have very real adverse consequences in regard to the financial situation of plaintiff and his family, again is unfortunate, but these are the kind of policy questions that fall squarely within the purview of Congress. Plaintiff insists that the denial of benefits to claimants and their families such as he and his family is confronted with, is manifestly contrary to the purpose of the SSI program, which is "to provide a minimally decent standard of living to destitute, blind, aged and disabled individuals." Chater, 163 F.3d at 1133 (quoting 42 U.S.C. § 1381); see also 20 C.F.R. § 416.110. Another stated goal of the program, however, is "to prevent the dissipation of its resources through neglect, abuse,

REPORT AND RECOMMENDATION
Page - 14

or fraud." Chater, 163 F.3d at 1133. Counting BAH cash payments for off-base private housing as income is not contrary to this legislative purpose, and, indeed, promotes it by ensuring they are treated the same as other similar types of financial resources. Further, the undersigned sees no reason why the former legislative purpose should take precedence over the latter, especially absent any expressed Congressional intent to the contrary.

Lastly, the parties differ over whether passage of the Heroes Earnings Assistance and Relief Tax Act of 2008 ("HEART Act"), P.L. 110-245, provides further support for the Commissioner's treatment of BAH prior to September 1, 2008.[5] Among other changes it made, the HEART Act amended 42 U.S.C. § 1382a(a)(2) to include within the meaning of the term "unearned income," "payments to or on behalf of a member of a uniformed service for housing of the member (and his or her dependents, if any) on a facility of a uniformed service, including payments . . . for housing that is acquired or contracted," and to require that "any such payments . . . be treated as support and maintenance in kind." HEART Act, Section 201; 42 U.S.C. § 1382a(a)(2)(H). As noted by defendants, while payments for on-base privatized housing are now expressly treated as non-cash unearned income, no similar changes were made to the treatment of payments for off-base private housing.

The undersigned agrees with defendant that these amendments reflect Congress's recognition that BAH for on-base and privatized military housing is to be treated differently from completely private off-base housing. As the House Report concerning those amendments makes clear, "cash remuneration paid to a member of the uniformed services" is to be treated "as earned income and certain housing payments to such members as in-kind support and maintenance for SSI program purposes." H.R. REP. 110-934, H.R. Rep No. 934, 110TH Cong., 2ND Sess. 2009, 2009 WL 34936. The changes made to the POMS that went into effect on or after September 1, 2008, reflect those amendments. For example, the POMS now also expressly provides that "[a]ll cash payments, other than for on-base or privatized military housing . . . are treated as earned income." POMS 00820.400C.1. It goes on to state in relevant part:

> **b. BAH for on base and privatized housing**
>
> Service members and their families living in on-base housing may receive free housing. Service members and their families living in on-base housing or in

---

[5]The HEART Act took effect "with respect to benefits payable for months beginning 60 days after the date of the enactment" thereof, which was June 17, 2008. Id., Section 204.

REPORT AND RECOMMENDATION
Page - 15

> privatized military housing may receive a BAH payment or the military may direct a BAH to a housing contractor by way of payroll deduction or allotment. In each case, the housing received is counted as outside ISM . . . The BAH is not cash income.
>
> **c. BAH for private housing**
>
> If service members and their families who live in private housing receive a BAH payment, it is earned income for SSI purposes.

POMS SI 00820.400C.2.

In contesting this view of the changes brought about by passage of the HEART Act, plaintiff points to another statement in the above House Report recognizing that "some military families who relied on the SSI program for financial support lost a portion of their benefits because of the treatment of certain types of military pay in determining eligibility and benefit amounts." H.R. REP. 110-934, H.R. Rep No. 934, 110TH Cong., 2ND Sess. 2009, 2009 WL 34936. Plaintiff argues this is precisely the reason he is now before the Court, the adverse financial impact on his family due to their loss of benefits. But, once more, plaintiff essentially is asking the Court to do what Congress has chosen not to. That is, Congress certainly could have changed the way the Commissioner treats BAH cash payments had it wanted to in passing the HEART Act, but did not do so. This clearly indicates it saw no reason to change, and accordingly at least impliedly recognized, the propriety of such treatment.

Plaintiff also complains about the effective date of the HEART Act, and the fact that it "does nothing for the nearly two years of benefits" he "relied on but which have since been taken away." (Dkt. #16, p. 5). However, even if the effective date was made retroactive, it would not have helped plaintiff, given Congress's tacit approval of the Commissioner's approach here. Besides, again, the Court cannot make retroactive what Congress clearly has decided should be prospective only. Defendant, therefore, is correct that to the extent the HEART Act can help plaintiff, his only recourse is to apply for SSI benefits again, even though, the undersigned recognizes, this will take even more time. Accordingly, the decision to uphold the finding of SSI ineligibility and benefits overpayment was proper in this case.

## CONCLUSION

Based on the foregoing discussion, the Court should find the ALJ properly concluded plaintiff was ineligible for SSI benefits due to the BAH received by his father, resulting in an overpayment thereof,

REPORT AND RECOMMENDATION
Page - 16

and therefore should affirm the ALJ's decision.[6]

Pursuant to 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 72(b), the parties shall have ten (10) days from service of this Report and Recommendation to file written objections thereto. See also Fed. R. Civ. P. 6. Failure to file objections will result in a waiver of those objections for purposes of appeal. Thomas v. Arn, 474 U.S. 140 (1985). Accommodating the time limit imposed by Fed. R. Civ. P. 72(b), the clerk is directed set this matter for consideration on **December 4, 2009**, as noted in the caption.

DATED this 12th day of November, 2009.

/s/ Karen L. Strombom
Karen L. Strombom
United States Magistrate Judge

---

[6] In their response brief, defendant states that current Social Security Administration records show recovery has been waived with respect to plaintiff's overpayment. While those records are not presently before the Court, plaintiff has not contested the truth of this statement. Accordingly, as it appears such overpayment has been waived, that issue no longer appears to be before this Court, and therefore the undersigned makes no finding with respect thereto.